**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **KEITH AND KECIA AVERY**<br>8810 Hemsley Drive<br>Clinton, MD 20735<br><br>**RUSSELL AND MADELINE<br>BROWNFIELD, JR.**<br>98 Cobblestone Lane<br>Le Claire, IA 52753<br><br>*Plaintiffs*,<br><br>v.<br><br>**J.G. WENTWORTH HOME LENDING,<br>LLC, successor to WESTSTAR<br>MORTGAGE, INC.**<br>3350 Commission Court<br>Woodbridge, VA 22192<br><u>Serve on:</u> CSC-Lawyers Incorporating Service<br>Company, Resident Agent<br>7 St. Paul Street, Suite 820<br>Baltimore, MD 21202<br><br>*Defendant*. | Civil Action No.: |

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs, Keith and Kecia Avery and Russell and Madeline Brownfield, Jr. on behalf of

themselves and on behalf of the entire class of persons similarly situated, by and through their

attorneys, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea &

Schmidt, LLC and Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph,

Greenwald and Laake, P.A., file this Class Action Complaint, sue the Defendant for cause, claim

damages, and state as follows:

## INTRODUCTION

1.   Plaintiffs Keith and Kecia Avery (the "Avery Plaintiffs") and Russell and Madeline Brownfield, Jr. (the "Brownfield Plaintiffs"), and alleged Class Members are borrowers who currently have or had a residential mortgage loan originated and/or brokered by Defendant WestStar Mortgage, Inc. ("WestStar"), predecessor to J.G. Wentworth Home Lending, LLC ("J.G. Wentworth"), which was or is secured by Plaintiffs' and Class Members' residential real property.

2.   Plaintiffs and alleged Class Members are victims of an illegal kickback scheme ("All Star Scheme") under which WestStar's loan officers, agents, and/or other employees received and accepted illegal kickbacks from All Star Title, Inc. ("All Star"), a Maryland-based title and settlement services company, in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*  WestStar and All Star laundered the kickbacks through third party marketing companies to conceal the illegal kickbacks and the All Star Scheme.

3.   West Star and All Star defrauded borrowers into paying for the illegal kickbacks by charging borrowers an amount that was not associated with any legitimate title or settlement service ("Kickback Overcharge") and imposed for the sole purpose of funding the illegal kickbacks.  West Star and All Star fraudulently misprepresented these charges on borrowers' Good Faith Estimates, HUD-1 Statements and other loan documents as associated with legitimate title and settlement services thereby defrauding borrowers into bearing the cost of the illegal enterprise.

4.     WestStar and All Star continuously and regularly used the U.S. Mail and interstate wires in furtherance of the All Star Scheme, and to identify and defraud borrowers into the All Star Scheme, willfully and intentionally engaging in a pattern of racketeering activity over a period of at least four years, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*

5.     The kickback and referral agreements, and resulting Kickback Overcharge, were fraudulently concealed by WestStar and All Star from Plaintiffs and alleged Class Members by: laundering kickbacks through third party marketing companies, false allocation of title and settlement fees and manipulation of the APR associated with the WestStar loans, and false and fraudulent representations and omissions in WestStar borrowers' loan documents.  These concealments prevented borrowers, regulators and auditors from discovering the Kickback Agreement, the All Star Scheme, and the injuries to WestStar borrowers therefrom, thereby allowing the kickbacks and fraudulent charges to continue.

## PARTIES

6.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

7.     Plaintiffs Keith and Kecia Avery are residents of Prince George's County, Maryland.

8.     Plaintiffs Russell and Madeline Brownfield, Jr. are residents of Scott County, Iowa.

9.     Defendant J.G. Wentworth Home Lending, LLC, formerly J.G. Wentworth Home Lending, Inc., is a limited liability company organized under the laws of Virginia. It is engaged in the business of consumer mortgage brokering and/or origination and/or lending and/or otherwise transacted business in the state of Maryland and in other states.

3

    **a.** J.G. Wentworth Company, a Delaware corporation, acquired 100% of WestStar's stock through a Stock Purchase Agreement completed on or about July 31, 2015.

    **b.** Upon consummation of the Stock Purchase Agreement, WestStar became an indirect, wholly-owned subsidiary of The J.G. Wentworth Company, and filed articles of conversion with the Virginia State Corporation Commission to change its name to J.G. Wentworth Home Lending, Inc., effective August 1, 2015.

    **c.** On December 31, 2015 at 11:59 p.m., J.G. Wentworth Home Lending, Inc. converted to J.G. Wentworth Home Lending, LLC.

    **d.** Following the acquisition, J.G. Wentworth Home Lending, Inc. and subsequently J.G. Wentworth Home Lending, LLC continuously transacted business in Maryland, specifically engaging in residential mortgage lending related to properties located in Maryland, as well as other banking and lending transactions.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 18 U.S.C. § 1964(c).

11. This Court has personal jurisdiction over the parties. Personal jurisdiction over Defendant J.G. Wentworth is appropriate because during the time period alleged herein WestStar continuously transacted business within this District and engaged in conduct that was directed at, and had the intended effect of causing injury to, persons residing in or located in this District, and such jurisdiction extends to J.G. Wentworth as WestStar's successor in interest.  In addition, J.G. Wentworth currently transacts business in this District.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2)-(3) and 18 U.S.C. § 1965.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

13.    At all relevant times, All Star is a Maryland corporation and a title and settlement service provider licensed in Maryland and regulated by the Maryland Insurance Administration. All Star is a licensed title and settlement service provider in more than 30 states and provides title and settlement services on residential mortgage loans, refinances and reverse mortgages secured by real property in 47 states.

**I.    The All Star Scheme**

   **A.    All Star and Participating Lenders Pay and Receive Kickbacks in Exchange for the Assignment and Referral of Residential Mortgage Loans to All Star and Employ Several Methods to Conceal the Kickbacks.**

14.    Beginning by at least 2008, All Star designs and executes a scheme ("All Star Scheme") to pay kickbacks to various mortgage lenders and their brokers, loan officers and other employees (collectively, "Participating Lenders") in exchange for the Participating Lender's assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services ("Kickback Agreement").

15.    All Star bases the amount of the kickback All Star paid on the number of loans the Participating Lender assigns and refers to All Star under the Kickback Agreement and the amount of profit All Star realizes on those loans.

16.    All Star pays, and Participating Lenders receive and accept, kickbacks in different forms and laundered by and through different channels.

17.    In some instances, All Star pays kickbacks by purchasing and delivering to a Participating Lender marketing materials for the Participating Lender to use in soliciting borrowers, most commonly postage to be used by a Participating Lender to send direct mail solicitations.

18.     In other instances, All Star pays cash kickbacks by checks written directly to a Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees.  Often, a Participating Lender or its employee receives and accepts a kickback check laundered by and through a sham entity set up for the express purpose of receiving and accepting kickbacks and concealing the same.

19.     In most instances, to further conceal the kickbacks, the Participating Lenders and All Star agree to have All Star not issue a check directly to the Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees, but instead launders the kickback payment through a third-party marketing company.

20.     Participating Lenders and/or their branch managers, mortgage brokers, loan officers, or other employees frequently use third party marketing companies (such as a direct mail, data and/or leads lists, telemarketing or live transfer leads providers) to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances and reverse mortgages, which increase the volume of loans the Participating Lender brokers or originates thereby increasing its net profit and commissions earned.

21.     All Star and Participating Lenders use a variety of third-party marketing companies to launder the kickbacks. Some of these marketing companies specialize in direct mail, while others specialize in producing data and leads lists of potential borrowers for direct mail or telemarketing solicitations.  Still other third-party marketing companies provide Participating Lenders "live transfer" leads in which a borrower who contacts a centralized telemarketing company is transferred "live" to the Participating Lender.

22.     Under the Kickback Agreement, the Participating Lender receiving and accepting the kickback from All Star identifies a third-party marketing company that the Participating

Lender uses for marketing services.  All Star then makes the kickback payment to the third-party marketing company, and the Participating Lender receives and accepts the kickback payment when the third-party marketing company applies the payment to the Participating Lender's account and for the benefit of the Participating Lender.

23.     All Star and Participating Lenders choose to launder kickback payments through third party marketing companies to conceal the fact that payment is made by All Star as well as the fact that All Star and the Participating Lender exchanged a thing of value related to the loans that are assigned and referred to All Star under the Kickback Agreement.

24.     All Star makes clear that the kickback payments are predicated on and will continue only if the Participating Lenders meet a "unit" or "production" goal of loans that are assigned and referred to All Star in exchange for the kickback. *See, e.g.*, Feb. 2, 2012 e-mail re: "unit goal" expectations, attached as **Exhibit 1**. With the laundering of kickbacks through third-party marketing companies, All Star and Participating Lenders hoped to be able to use claims of "co-marketing" as a sham and to further conceal the kickbacks and Kickback Agreement from borrowers, regulators and law enforcement.

### B.      All Star and Participating Lenders Conspire and Agree To Defraud Borrowers Into Paying for the Illegal Kickbacks.

25.     One of the purposes of the All Star Scheme is to defraud borrowers into paying for the illegal kickbacks and to ensure the continuation of illegal kickback payments to Participating Lenders.

26.     For this purpose, All Star and Participating Lenders conspire to and agree to fix the prices All Star charges the Participating Lender's borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement.

27. The prices All Star and the Participating Lenders fix under the Kickback Agreement include a sum certain amount that is not associated with any legitimate title or settlement service and is charged for the sole purpose of forcing borrowers to pay for the cost of the illegal kickbacks All Star is paying to Participating Lenders ("Kickback Overcharge").

28. As part of the Kickback Agreement, All Star and Participating Lenders conspire to and agree that the Participating Lender will refuse to deal with any other title and settlement services company on those loans generated by the kickbacks, such that all loans generated by the Kickback Agreement are referred to All Star and are subject to Kickback Overcharges.

29. Participating Lenders benefit from these agreements because: (i) the Kickback Overcharge funds the illegal kickbacks used by Participating Lenders to solicit borrowers, generate residential mortgage loans, and earn substantial interest and commissions, and (ii) the costs for title and settlement service fees are financed into the loan and paid for by borrowers from loan proceeds such that the Participating Lender earns interest and other fees on the fixed prices and overcharges.

### C.    All Star and Participating Lenders Use the U. S. Mail and Interstate Wires to Identify and Lure Borrowers into the All Star Scheme.

30. All Star and Particiapting Lenders conduct a pattern of racketeering activity by regularly and consistently use the interstate mails and wires to further the All Star Scheme.

31. All Star and Participating Lenders regularly and consistently choose to transmit, receive and accept illegal kickback payments over interstate wires.

32. All Star and Participating Lenders also regularly and consistently choose to use the interstate wires to administer the All Star Scheme, negotiating, agreeing to and enforcing

the Kickback Agreement, fixed prices, and resulting Kickback Overcharges by and through communications over interstate wires.

33. All Star and Participating Lenders also regularly and consistently use the interstate mails and wires to identify, solicit and lure borrowers into the All Star Scheme.

34. Potential borrowers are identified by the third-party marketing companies through which All Star and Participating Lenders are laundering the kickbacks.  Many of these third-party marketing companies specialize in identifying and soliciting potential borrowers, and compiling and selling borrower sales and marketing "leads lists."

35. Participating Lenders use these lists to solicit borrowers often through printed direct mail pieces such as postcards, letters, "SNAP packs" (mailers with perforated edges the recipient rips or "snaps" open), and other printed material that encourage borrowers to contact the Participating Lender and apply for a residential mortgage loan, refinance or reverse mortgage.

36. Participating Lenders and All Star, by and through third party marketing companies, cause borrower data and leads list to be merged onto these direct mail solicitations, and Participating Lenders, by and through the third-party marketing companies, cause these hundreds of thousands of fraudulent solicitations to be sent through the interstate U.S. mails, in violation of 18 U.S.C. § 1341.

37. All Star and Participating Lenders also obtain from third party marketing companies borrower data and leads list to solicit borrowers over the telephone, and Participating Lenders use interstate wires to make these telemarketing calls to potential borrowers in violation of 18 U.S.C. § 1343.

38. Participating Lenders also receive "live transfer" leads wherein a borrower calls a centralized call center, and then is transferred by the call center "live" to the Participating Lender. The third marketing company delivering the live transfer leads transmits the "live transfer" over interstate wires, and the Participating Lender receives the live transfer calls over interstate wires.

39. All Star's records document that these borrower solicitation techniques lured thousands of borrowers into the All Star Scheme.

**II.   By 2010, WestStar Begins Participating in the All Star Scheme, Forms an Association in Fact Enterprise with All Star, and Receives Almost a Half Million Dollars Performing the Kickback Agreement.**

40. By at least January 2010, WestStar, by and through its branch managers, loan officers and other employees, enters into an agreement with All Star to accept and receive kickbacks from All Star in exchange for the assigning and referring WestStar loans, refinances and reverse mortgages to All Star for title and settlement services.

41. At all relevant times, the WestStar branch managers and loan officers participating in the All Star Scheme are licensed mortgage brokers and/or authorized loan officers, and at all relevant times were acting within the scope of the business relationship and their employment on behalf of WestStar, specifically seeking borrowers and originating and securing loans for residential mortgages through WestStar and/or brokering such loans through WestStar to other lenders with whom WestStar authorized, referring WestStar borrowers to title companies, and working with title companies to close these loans.  All activities, including any interaction with All Star, were for the benefit of WestStar.

42. During the relevant time, WestStar operates a branch located at 161 Fort Evans Road NE, Suite 325 in Leesburg, VA 21076.

**A.    Beginning in the Fourth Quarter of 2011, All Star pays over $13,000 to WestStar in exchange for the assignment and referral of WestStar borrowers to All Star for title and settlement services.**

43.    By September 30, 2011, WestStar and All Star conspire to and agree to fix prices charged borrowers for title and settlement services on loans assigned and referred by WestStar to All Star for title and settlement services under the Kickback Agreement at $1400 plus title. **Exhibit 2,** Sept. 30, 2011 Email.  These prices are $700 more than All Star is charging borrowers assigned and referred from other lenders participating in the All Star Scheme for similar kinds of loans. **Exhibit 3**, October 2011 Fee Sheet.

44.     This Kickback Overcharge is the minimum amount of actual damages sustained by borrowers West Star assigns and refers to All Star in performance of the Kickback Agreement and the pattern of racketeering activity All Star and WestStar conduct in furtherance of the All Star Scheme during this time period.

45.    This Kickback Overcharge is not associated with any legitimate title or settlement service and is charged for the express purpose of forcing borrowers to pay for the kickbacks All Star pays, and WestStar receives and accepts, under the Kickback Agreement.

46.    WestStar requires All Star to pay kickbacks, and charge borrowers the Kickback Overcahrge, as a condition of switching to All Star from another title and settlement service company that is paying WestStar kickbacks. **Exhibit 4,** Oct. 4, 2011 Email.

47.    In correspondence related to the fixed prices, All Star states "we have a new client. Address is 161 Fort Evans Road, Suite 325 Leesburg, VA 20176." **Exhibit 4**.  Plaintiffs believe, and therefore aver, that this reference is to the WestStar branch located in Leesburg, Virginia and managed by Jody and Hakim Alston, loan officers employed by WestStar in the WestStar Leesburg Branch.

48.     Based on this communication, Plaintiffs believe, and therefore aver, that the All Star pays klcikbacks to WestStar for loans assigned and referred from the WestStar Leesburg Branch.

49.     In October 2011, All Star pays WestStar four kickbacks of $1,325 each on October 6, 13, 21, and 27, 2011.  All Star and WestStar choose to launder all four kickback sthrough Titan List & Mailing Services, Inc. ("Titan"), a Florida-based data and direct mail marketing company.

50.     West Star and All Star choose to transmit all four kickback payments over interstate wires, with the first two kickback payments sent by wire with the wire originating at All Star's bank in Maryland and West Star receicving and accepting the payment by and through Titan in Florida. WestStar and All Star choose to transmit the second two kickback paymenst over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

51.     WestStar chooses to use all four All Star kickback payments to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme.  These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

52.     In October 2011, WestStar in fact refers 35 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

53.   In November 2011, All Star pays WestStar two kickbacks, a $2,650 kickback on November 3, 2011, and a $1,325 kickback on November 8, 2011. All Star and WestStar choose to launder both kickbacks thorough Titan.

54.   West Star and All Star choose to transmit both November 2011 kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

55.   WestStar chooses to use both November 2011 All Star kickback payment to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme.  These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

56.   In the month of November 2011, WestStar in fact assigns and refers 31 loans to All Star for title and settlement service thereby performing the Kickback Agreement.

57.   On or about December 20, 2011, All Star pays a $4,212.50 kickback to WestStar. All Star and WestStar choose to launder the kickback through Titan.

58.   West Star and All Star choose to transmit the kickback payment over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

59.   WestStar chooses to use All Star's December 2011, kickback to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star

Scheme.  These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

60.     In December 2011, WestStar in fact assigns and refers 39 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

61.     All Star tracks the loans that are assigned and referred by WestStar in performance of the Kickback Agreement to determine whether and how much of a kickback All Star will agree to pay to WestStar in the coming month.  *See* **Exhibit 5**, Dec. 1, 2011 e-mail.

**B.      In the First Quarter of 2012, All Star Increases the Value of the Kickbacks and Doubles the Amount of Kickbacks it Pays to WestStar to over $30,000**

62.     In January 2012, All Star pays WestStar three kickbacks of $2,045 each on January 4, 9 and 17, 2012.  All Star and WestStar choose to launder all three kickback payments through Titan.

63.     West Star and All Star choose to transmit all three kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

64.     WestStar chooses to use all three January 2012 kickbacks to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

65.     In January 2012, WestStar in fact assigns and refers 51 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

14

66. In February 2012, All Star pays WestStar five kickback payments of $3,471 each on February 1, 6, 15, 21, and 27, 2012.  All Star and West Star choose to launder all five kickbacks through Titan.

67. WestStar and All Star chooses to transmit all five kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

68. WestStar chooses to use all five Febraary 2012 All Star kickbacks to cause Titan to print and mail WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

69. In February 2012, West Star assigns and refers 64 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

70. Also in February 2012, WestStar communicates with All Star about Linear Title, an All Star competitior that charges $395 plus title for the same services that All Star provides. *See* **Exhibit 6**, Feb. 6, 2012 e-mail.

71. Despite this information about Linear Title and its lower fees, WestStar chooses to continue to receive kickbacks from All Star and to charge WestStar borrowers fixed prices and a Kickback Overcharge unrealted to any legitimate title and settlement service.

72. The prices charged by All Star are $905-1,005 more than Linear is charging WestStar borrowers for title and settlement services ("Market Overcharge"). This Market Overcharge is an alternative measure of damages, constituting the minimum amount of

actual damages incurred by WestStar borrowers assigned and referred to All Star by WestStar in performance of the Kickback Agreement and the pattern of racketeering activity All Star and WestStar conduct in furtherance of the All Star Scheme during this time period.

73. In March 2012, All Star pays WestStar four kickbacks of $3,471 each on March 5, 13, 21, and 29, 2012. All Star and WestStar choose to launder all four kickback payments through Titan.

74. West Star and All Star choose to transmit all four kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

75. WestStar chooses to use all four March 2012 kickbacks to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

76. In March 2012, WestStar assings and refers 29 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

   **C.     All Star continues to increase the value of the kickbacks to WestStar, and
            Doubles the Kickbacks paid from the last quarter to Over $60,000 in the
            Second Quarter of 2012.**

77. In April 2012, All Star pays WestStar four kickback payments of $3,471 each on April 5, 10, 17 and 24, 2012. All Star and WestStar choose to launder all four kickback payments through Titan.

78. WestStar and All Star chooses to transmit all four kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

79. WestStar chooses to use the all four April 2012 kickbacks to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

80. In April 2012, WestStar assigns and refers 28 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

81. In May 2012, All Star pays WestStar five kickback payments of $5,500 each on May 2, 7, 14, 23 and 29, 2012. All Star and WestStar choose to launder all five kickbacks through Titan.

82. WestStar and All Star choose to transmit all five kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida

83. WestStar chooses to use the all five May 2012 kickbacks to cause Titan to print and mail WestStar solicitations to potential borrowers.  These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

84.     In May 2012, WestStar in fact assigns and refers 50 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

85.     All Star's President Jason Horwitz and Marketing Representative Alex Golobordko continue to evaluate and monitor the number of loans being assigned and referred to All Star in exchange for the increased volume and value of kickbacks and reiterating to WestStar its unit goal requirements to justify continuing paying the kickbacks – "…a minimum of 50 closings." *See* **Exhibit 7**, May 3, 2012 e-mail.

86.     In June 2012, All Star pays WestStar four kickback payments of $5,500 each on June 6, 13, 19 and 23, 2012.  All Star and WestStar choose to launder all four kickback payments through Titan.

87.     WestStar and All Star chooses to transmit all four kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

88.     WestStar chooses to use the all four June 2012 kickbacks to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

89.     In June 2012, WestStar in fact assigns and refers 49 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

**D. In the Third Quarter of 2012, All Star Pays Over $100,000 in Kickbacks to WestStar in Exchange for Assigning and Referring Borrowers to All Star for title and settlement services.**

90.   In July 2012, All Star pays WestStar four kickback payments, one payment of $9,500 on July 2, 2012, and three kickback payments of $7,800 each on July 9, 16 and 23, 2012. All Star and WestStar choose to launder all four kickback payments through Titan.

91.   WestStar and All Star choose to transmit all four kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

92.   WestStar chooses to use all four July 2012 kickbacks to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

93.   In July 2012, WestStar in fact assigns and refers 143 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

94.   All Star makes clear that with this kickback WestStar "better close 40+ in July and 50+ in August and moving forward … and I would really hope for 60+."   In these communications All Star refers to "Hakim" which Plaintiffs believe, and therefore aver, is a reference to Hakim Alston a loan officer and branch manager employed by WEstStar in WestStar's Leesberg, Virginia Branch.   *See* also **Exhibit 8**, July 2, 2012 e-mail regarding invoice.

95.   In August 2012, All Star pays WestStar five kickback payments of $7,800 each on August 6, 13, 20, 28, and 31, 2012. All Star and WestStar choose to launder all five kickback payments through Titan.

96.     WestStar and All Star choose to transmit all five kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

97.     WestStar chooses to use all five July 2012 kickbacks to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

98.     In August 2012, WestStar in fact assigns and refers 50 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

99.     In September 2012, All Star pays WestStar three kickback payments of $7,800 each on September 11, 18 and 24, 2012.   All Star and WestStar choose to launder all three kickbacks through Titan.

100.    WestStar and All Star choose to transmit all three kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

101.    WestStar chooses to use all three September 2012 kickbacks to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme.   These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

102.   In Spetember 2012, WestStar in fact assigns and refers 11 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

**E. All Star Continues to Pay WestStar Weekly Kickbacks in Exchange for Assigning and Referring Borrowers to All Star for title and settlement services That in the Fourth Quarter of 2012 Total Over $100,000.**

103.   In October of 2012, All Star pays WestStar five kickbacks of $7,800 each, on October 1, 9, 15, 22, and 29, 2012.  All Star and WestStar choose to launder all of these kickbacks through Titan.

104.   WestStar and All Star choose to transmit all of the October kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

105.   WestStar chooses to use all of the October 2012, All Star kickbacks to cause Titan to print and mail WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

106.   In October 2012, WestStar in fact assigns and refers 57 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

107.   In Novermber 2012, All Star pays WestStar four kickbacks of $7,800 each on November 5, 13, 19 and 26, 2012.  All Star and WestStar choose to launder all of these kickbacks through Titan.

108. WestStar and All Star chooses to transmit all of the Novermber, 2012, kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

109. WestStar chooses to use all of the November 2012, All Star kickbacks to cause Titan to print and mail WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

110. In November 2012, WestStar in fact assigns and refers 34 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

111. The next month, All Star pays WestStar two kickbacks of $7,800 and $23,400 on December 3 and 17, 2012. All Star and WestStar choose to launder both of these kickbacks thorugh Titan.

112. WestStar and All Star chooses to transmit these two kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida

113. WestStar chooses to use both of these All Star kickbacks to cause Titan to print and mail WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate;

that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

114. In December 2012, WestStar in fact assigns and refers 60 laons to All Star for title and settlement services thereby performing the Kickback Agreement.

**F. The Weekly Kickbacks Continue in 2013, with All Star Paying Over $75,000 in the First Quarter.**

115. In January 2013, All Star pays WestStar four kickbacks of $7,800 each on January 9, 15, 22, and 28, 2013.  All Star and WestStar choose to launder all of these kickbacks through Titan.

116. WestStar and All Star choose to transmit all of the January 2013, kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

117. WestStar chooses to use each of the January 2013, All Star kickbacks to cause Titan to print and mail WestStar solicitations to lure potential borrowers into the All Star Scheme. These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

118. In January 2013, WestStar in fact assigns and refers 64 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

119. All Star continues to monitor the volume of loans being assigned and referred to All Star by WestStar in exchange for the kickbacks paid, with Jason Horwitz concluding bluntly:

"If they want more money, close more loans. It's not rocket science." See **Exhibit 9**, Jan. 31, 2013.

120. The next month – February 2013 - All Star and WestStar increase the fixed prices charged for title and settlement services associated with WestStar loans referred to All Star by $100 to $1,500 plus title insurance, which was done so that All Star could recover more of the kickbacks it paid to WestStar. *See* **Exhibit 10**, Feb. 28, 2013 e-mail. These prices are $900 more than All Star is charging borrowers assigned and referred from other lenders participating in the All Star Scheme for similar kinds of loans. *See* **Exhibit 11**, May 6, 2013 All Star Fee Spreadsheet.

121. This Kickback Overcharge is the minimum amount of actual damages sustained by borrowers West Star assigns and refers to All Star in performance of the Kickback Agreements and the pattern of racketeering activity All Star and WestStar conduct in furtherance of the All Star Scheme during this time period.

122. This Kickback Overcharge is not associated with any legitimate title or settlement service and is charged for the express purpose of forcing borrowers to pay for the kickbacks All Star pays, and WestStar receives and accepts, under the Kickback Agreement.

123. All Star and WestStar cause these fixed prices to be programmed into "TitleHound", software All Star uses to produce borrower loan documents. As a result, the fixed prices are automatically inputted into borrower loan, thereby automatically performing the Kickback Agreement and the pattern of racketeering activity All Star and WestStar conduct in furtherance of the All Star Scheme. *See* Aug. 3, 2012 e-mail with TitleHound, attached as **Exhibit 12**.

124.    The next month, All Star pays WestStar four kickback payments: 2 payments of $7,800 each on February 5 and 21, 2013, and 2 payments of $5,200 each on February 11 and 27, 2013. All Star and West Star choose to launder all of these kickbacks through Titan.

125.    WestStar and All Star choose to transmit all of the February 2013, kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

126.    WestStar chooses to use all of the February 2013, All Star kickback to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme.  These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

127.    In February 2013, WestStar in fact assigns and refers 51 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

128.    The next month, All Star pays WestStar four kickbacks of $5,200 each on March 8, 15, 21, and 26, 2013. All Star and WestStar choose to launder all of these kickbacks through Titan.

129.    WestStar and All Star choose to transmit all of the March 2013, kickback payment over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

130.    WestStar chooses to use all of the March 2013, Al Star kickbacks to cause Titan to print and mail tens of thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme.  These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

131.    In March 2013, WestStar in fact assigns and refers 39 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

   **G. In the Second Quarter of 2013, All Star Pays Almost $50,000 in Kickbacks to WestStar in Exchange for the Assignment and Referral of WestStar Loans to All Star for title and settlement services.**

132.    In April 2013, All Star pays WestStar three kickbacks of $5,200 each on April 2, 8 and 25, 2013.  All Star and WestStar choose to launder all of these kickbacks through Titan.

133.    WestStar and All Star choose to transmit all of the April 2013, kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

134.    WestStar chooses to use all of the April 2013 All Star kickbacks to cause Titan to print and mail tens of thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme.  These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

135.    In April 2013, WestStar in fact assigns and refers 26 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

136.    In May 2013, All Star pays WestStar four kickbacks of $5,200 each on May 6, 14, 17 and 28, 2013.  All Star and WestStar choose to launder all of these kickbacks through Titan.

137.   WestStar and All Star chooses to transmit all four of these kickback payments over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

138.   WestStar chooses to use these May 2013 All Star kickbacks to cause Titan to print and mail thousands of WestStar solicitations to lure potential borrowers into the All Star Scheme.  These WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

139.   In May 2013, WestStar in fact assigns and refers 16 loans to All Star for title and settlement services thereby performing the Kickback Agreement.

140.   Two weeks later, on or about June 11, 2013, All Star pays a total kickback of $10,400.00 to WestStar.  All Star and WestStar choose to launder this kickback through Titan.

141.   West Star and All Star chooses to transmit the kickback payment over interstate wires, with All Star e-mailing or faxing the kickback payment in the form of a credit card authorization, to WestStar over interstate wires, with the payment originating from All Star in Maryland and WestStar receiving the payment, by and through Titan, in Florida.

142.   WestStar chooses to use the June 2013 All Star kickback to cause Titan to print and mail WestStar solicitations to be mailed to potential borrowers.   Plaintiffs believe, and

therefore aver, that these WestStar solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the WestStar solicitation is placed in the mail in one state – Florida – and delivered to the potential borrower in another state.

143.   In June 2013, WestStar in fact assigns and refers at least 1 loan for title and settlement services thereby performing the kickback agreement.

144.   Based on the continuing pattern of practice between All Star andWestStar, Plaintiffs believe, and therefore aver, that additional known and unknown WestStar loan officers and branch managers assign and refer loans to All Star in furtherance and performance of the Kickback Agreement and the All Star Scheme, including loan officers and branch managers from the WestStar Woodbridge Branch located at 330 Commission Court, Woodbridge, Virginia, and the WestStar Abingdon Branch located at 3434 Box Hill Corp Center Drive in Abingdon, Maryland.

145.   Based on the continuing pattern of practice between All Star and WestStar, Plaintiffs believe, and therefore aver, that All Star pays kickbacks to WestStar by and through other third-party marketing companies in addition to those identified herein.

146.   As a result of WestStar's performance of the Kickback Agreement and the pattern of racketeering activity All Star and WestStar conduct in furtherance of the All Star Scheme, WestStar borrowers, including Plaintiffs and alleged Class Members, are harmed because because they are defrauded into being charged and paying amounts that are not related to any legitimate title and settlement services; are charged and pay higher amounts for title and settlement services that they would have without the Kickback Agreement and the All Star Scheme, are denied kickback free title and settlement

28

services, and are denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

147. No title services are provided by any WestStar employee and/or agent, associated with the receipt and acceptance of the kickbacks. The payment by All Star and the receipt and acceptance by WestStar of the kickbacks are made solely for the assignment and referral of WestStar borrowers to All Star.

**FACTUAL ALLEGATIONS RELATED TO**
**THE INDIVIDUAL CLASS REPRESENTATIVES**

148. Plaintiffs' transactions and the course of events thereafter exemplify the working of the Kickback Agreement and the All Star Scheme and are typical of all alleged Class Members' transactions.

   **a. The Avery Plaintiffs' Loan**

149. In or about February 2012, Plaintiffs Keith and Kecia Avery obtain a residential mortgage loan originated by WestStar through Jody Alston in relation to the refinancing of their residential real property and principal residence located at 8810 Helmsley Drive, Clinton, MD 20735. The Avery Plaintiffs' loan settles on February 29, 2012 with WestStar as the lender.

150. Jody Alston assigns and referrs the Avery Plaintiffs' loan to All Star in performance of the Kickback Agreement and as quid pro quo for the kickbacks All Star pays and WestStar receives and accepts in January 2012 by and through Titan and identified in ¶62, thereby performing the Kickback Agreement, depriving the Avery Plaintiffs of their choice of title and settlement service provider, and denying the Avery Plaintiffs kickback-free title and settlement services.

151.   All Star charges the Avery Plaintiffs $2,186.04 in total title and settlement service fees, which includes the $1,400 fee to All Star before the title insurance premium, thereby performing the Kickback Agreement and related fixed prices. *See* **Exhibit 13,** All Star March Fundings Spreadsheet.

152.   These title and settlement service fees include the $700 Kickback Overcharge described in ¶43, which is the minimum amount of the Avery Plaintiffs' actual damages for their injury resulting from the Kickback Agreement, All Star Scheme, and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme.

153.   In the alternative, these title and settlement service fees charged include the $905 Market Overcharge described in ¶72, which is the alternative minimum amount of the Avery Plaintiffs' actual damages for their injury resulting from the Kickback Agreement, All Star Scheme and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme.

154.   The Avery Plaintiffs paid for these charges when All Star disbursed proceeds from the Avery Plaintiffs' loan in payment of these title and settlement service charges.

155.   As a direct and proximate result of the Kickback Agreement and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme, the Avery Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback Agreements and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme; (ii) were defrauded into being charged and paying amounts not associated with any legitimate title and settlement service and to fund illegal

kickbacks; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

156.    As a direct and proximate result of the Kickback Agreement, All Star Scheme and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme, the Avery Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback Agreement, All Star Scheme and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme, and suffered actual damages in the amount of between approximately $700-905 and, on information and belief, additional amounts.

        1.    **The Brownfield Plaintiffs' Loan**

157.    In or about March 2012, Plaintiffs Russell and Madeline Brownfield obtain a residential mortgage loan originated by WestStar through Marc Daniel Plank, a loan officer employed by WestStar in the WestStar Leesberg Branch, in relation to the refinance of their residential real property and principal residence located at 125 Sunlight Court, Frederick, MD 21702.  The Brownfield Plaintiffs' loan settles on March 23, 2012 with WestStar as the lender.

158.    The WestStar Leesburg Branch assigns and refers  the Brownfield Plaintiffs' loan to All Star in performance of the Kickback Agreement and as quid pro quo for the kickbacks All Star pays and WestStar receives and accepts in February 2012 by and through Titan and identified in ¶66, thereby performing the Kickback Agreement, depriving the

Brownfield Plaintiffs of their choice of title and settlement service provider, and denying the Brownfield Plaintiffs kickback-free title and settlement services.

159.    All Star charges the Brownfield Plaintiffs $2,268.06 in total title and settlement service fees, which includes the $1,400 fee to All Star before the title insurance premium, thereby performing the Kickback Agreement and the related fixed prices. *See* **Exhibit 13,** All Star March Fundings Spreadsheet.

160.    The Brownfield Plaintiffs believe, and therefore aver, the price for title and settlement service fees All Star charges the Brownfield Plaintiffs is higher than the same charges would have been without the Kickback Agreement, All Star Scheme and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme.

161.    These title and settlement service fees include the approximately $700 Kickback Overcharge described in ¶43, which is the minimum amount of the Brownfield Plaintiffs' actual damages for their injury resulting from the Kickback Agreement, All Star Scheme and pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme.

162.    In the alternative, these title and settlement service fees charged include the $905 Market Overcharge described in ¶72, which is the alternative minimum amount of the Brownfield Plaintiffs' actual damages for their injury resulting from the Kickback Agreement, All Star Scheme and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme.

163.    The Brownfield Plaintiffs paid for these charges when All Star disbursed proceeds from the Brownfield Plaintiffs' loan in payment of these title and settlement service charges.

164.   As a direct and proximate result of the Kickback Agreements, All Star Scheme and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme, the Brownfield Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback Agreements and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme; (ii) were defrauded into being charged and paying amounts not associated with any legitimate title and settlement service and to fund illegal kickbacks; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers..

165.   As a direct and proximate result of the Kickback Agreement, All Star Scheme, and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme, the Brownfield Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback Agreement, All Star Scheme and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme, and suffered actual damages in the amount of between approximately $700-905 and, on information and belief, additional amounts.

## FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

166.   Essential to the All Star Scheme, WestStar and All Star undertake affirmative acts that fraudulently conceal the Kickback Agreement, the resulting kickbacks and fixed prices, and the actual injury and damages to borrowers, including Plaintiffs and alleged Class Members.

I.      **All Star and WestStar Conceal the Kickbacks By Laundering the Kickbacks through Third Party Marketing Companies and Sham Entities.**

167.    As described in ¶¶ 14-24 above, WestStar and All Star chose to conceal the fact and payment of kickbacks by consistently and regularly laundering kickbacks through third party marketing companies.

II.     **WestStar and All Star's False Allocation of Fees and APR Manipulation**

168.    The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage. While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes both the interest rate of the loan plus certain other lender fees, such as origination fees, discount points and some closing costs, including some title and settlement service fees.  The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate.  Lenders are required to report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

169.    The title and settlement service fees that are excluded in the APR calculation are defined by TILA.  12 C.F.R. § 1026.4(c). Because some fees are excluded from the APR (and others are not), title and settlement service companies and lenders can manipulate – and falsely minimize – the APR by falsely allocating amounts charged for title and settlement services to those categories of fees that are excluded from the APR calculation.

170.    As a regular and continuing business practice, WestStar and All Star allocate the charges for title and settlement services associated with a borrower's loan only to those categories

of title services not included in the APR, thereby falsely minimizing the APR reported on WestStar borrowers' loan documents and required federal disclosures.

171.   For example, "fees for title examination, abstract of title, [and] title insurance" are excluded from the APR calculation – *see* 12 C.F.R. § 1026.4(c)(7)(i) – while a settlement or closing fee and an application signing fee are settlement service costs required to be included in the APR calculation.   *See* 12 C.F.R. § 1026.4(a)(1)(i). By allocating the charges associated with conducting a settlement or closing to the category of "title exam" or "abstract" the result is a false, and falsely minimized, APR.

172.   Despite conducting a settlement or closing with each WestStar borrower, All Star and WestStar choose to not allocate any amount of All Star's charges associated with a borrower's loan to "settlement or closing fee" because that charge is included in the APR. Instead, All Star and WestStar allocate all charges, including that portion attributable to conducting a settlement or closing, to "Title Exam" or "Abstract", which are excluded from the APR.

173.   All Star claims the false allocation of fees and manipulation of the APR as a regular business practice as early as 2011 and at least through October 2015, allocating all charges for title and settlement services to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the APR.  *See, e.g.*, June 6, 2011 E-mail, attached as **Exhibit 14**; September 24, 2015 E-mail, attached as **Exhibit 15**; October 6, 2015 E-mail, attached as **Exhibit 16**.

174.   WestStar participates in and ratifies this false allocation of fees.  All Star communicates to WestStar that it will allocate the $1400 in fixed fees under the Kickback Agreement to Title Exam and Abstract – "I always put it $700 exam and $700 abstract …". WestStar

ratified this false allocation of fees routinely approving HUD-1 statements with this false allocation.  When WestStar is determing where to put the attorneys' fee charged for transactions applicable to properties in states that require an attorney to close the loan, Christy Turmino, a loan processor and branch manager employed by WestStar in the WestStar Woodbridge Branch advises All Star, "The 700&700 fees can stay under line 1109&1110".  Based on this continuing pattern of practice, Plaintiffs believe, and therefore aver, that All Star and WestStar engage in the false allocation and manipulation of the APR throughout the time period WestStar is participating in the All Star Scheme.

175.   WestStar and All Star's choice to falsely allocate fees resulted in the fraudulent reporting of false APR's and the false, and falsely minimized, representation of the cost of the loan to the WestStar borrower.  This prevented WestStar borrowers from discovering that their charges were artificially inflated and a portion of their charges were not associated with a legitimate title and settlement service and charged for the purpose of paying for illegal kickbacks.

176.   As a regular business practice, All Star used various software programs, including "Titlehound", to produce borrower loan documents, including documents reporting the APRs associated with a loan.  All Star caused this software, including Titlehound, to be programmed to make these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce WestStar loan documents to present to borrowers and on which WestStar and All Star intended borrowers rely.

177.   WestStar and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently concealed from WestStar borrowers the illegal kickbacks, the amounts charged borrowers for the purpose of paying for the illegal kickbacks and not associated

with any legitimate title and settlement service, and the fixed and artificially inflated prices for title and settlement services resulting from the Kickback Agreement, All Star Scheme and the pattern of racketeering activity WestStar performs with All Star in furtherance of the All Star Scheme, and affirmatively prevented WestStar borrowers from discovering their injuries resulting therefrom.

### III. False Representations in WestStar and The Money Store Borrowers' Loan Documents

178.   In addition to laundering the kcibacks through third party marketing companies, falsely allocating fees and maniputlating the reported APR, WestStar and All Star choose to make false representations on borrowers' loan documents.

179.   At all relevant times, federal law required WestStar, as lender, was required to provide a "Good Faith" Estimate to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b).

180.   Block 4 of the "Good Faith" Estimate is to state only the charges for "title services and lender's title insurance".

181.   As a regular pattern of practice, WestStar falsely includes in Block 4 charges that are not title services and lender's title insurance including the Kickback Overcharge and/or Market Overcharge associated with the Kickback Agreement and the pattern of racketeering activity All Star performs with WestStar in furtherance of the All Star Scheme.

182.   WestStar's choice to falsely include these charges in Block 4 of the "Good Faith" Estimate conceals from borrowers: (i) the fact and amount of the Kickback Overcharge and/or Market Overcharge; (ii) the illegal kickbacks, and (iii) the coordinated business relationship between All Star and WestStar under the Kickback Agreement, the All Star

Scheme the All Star Scheme and the pattern of racketeering activity All Star performs with The Money Store in furtherance of the All Star Scheme..

183.    In addition, the loan originator must state in Block 1 of the Good Faith Estimate:

> [A]ll charges that loan originators involved in this transaction will receive, except for any charge for the specific interest rate chosen (points). A loan originator may not separately charge any additional fees for getting this loan, including for application, processing, or underwriting. The amount stated in Block 1 is subject to zero tolerance, *i.e.,* the amount may not increase at settlement.

12 C.F.R. App'x C to Part 1024 – Instructions for Completing the Good Faith Estimate (GFE) Form.

184.    As a regular pattern of practice, WestStar chooses to falsely omit reporting the Kickback Overcharge in Block 1 of the Good Faith Estimate even though the Kickback Overcharge was a charge WestStar would receive in the transaction.

185.    WestStar's choice to falsely omit the Kickback Overcharge from Block 1 of the "Good Faith" Estimate conceals from borrowers: (i) the fact and amount of the Kickback Overcharge; (ii) the illegal kickbacks, and (iii) the coordinated business relationship between All Star and WestStar under the Kickback Agreement, the All Star Scheme and the pattern of racketeering activity All Star performs with The Money Store in furtherance of the All Star Scheme.

186.    In addition to the GFE, federal law, at all relevant times, required each borrower to receive a HUD-1 Settlement Statement at the closing or settlement of a loan. The settlement agent produces the HUD-1, but federal regulations require the loan originator to provide to the settlement agent all information appearing in the HUD-1 statement.

187. Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

188. As a continuing pattern and regular business practice, All Star and WestStar choose and cause the false allocation of fees described in ¶¶168-177 to repeat and appear on WestStar borrowers' HUD-1 statements in Section 1100.

189. As a continuing pattern and regular business practice, WestStar omits and fails to describe anywhere on a borrower's HUD-1 statement the amount of the kickback received by WestStar related to the borrower's loan or the fact that All Star has paid a kickback to WestStar for the assignment and referral of the borrower's loan. WestStar is required to report the kickback on Line 808 of the HUD-1, and perhaps other lines.

190. As a continuing pattern of practice, WestStar chooses to omit and fails to describe anywhere on a borrower's HUD-1 statement that the borrower is being charged or the amount of any Kickback Overcharge and/or Market Overcharge associated with the fixed prices under the Kickback Agreements. WestStar is required to report these amounts in Section 1100 or Section 1300 of the HUD-1.

191. These false representations and omissions, presented to WestStar borrowers by All Star – as WestStar's agent – at closing, fraudulently conceal: (i) the illegal kickbacks; (ii) the fact and amount of the Kickback Overcharge and the fact that borrowers are being charged an amount not associated with any legitimate title and settlement service; and (iii) the coordinated business relationship between All Star and The Money Store under the Kickback Agreement, the All Star Scheme and the pattern of racketeering activity All Star performs with The Money Store in furtherance of the All Star Scheme.

**IV.     Plaintiffs' Reasonable Diligence**

192.    As a result of the fraudulent concealments by WestStar and All Star, the Avery Plaintiffs
and Brownfield Plaintiffs (and, upon information and belief, all alleged Class Members)
had no actual notice before, at or after the closing of their WestStar loan of the illegal
kickbacks, the exchange of any thing of value between the WestStar and All Star, the
Kickback Overcharge and/or Market Overcharge, or the coordinated business relationship
of All Star and WestStar under the Kickback Agreement, All Star Scheme and the pattern
of racketeering activity All Star performs with WestStar in furtherance of the All Star
Scheme.

193.    Plaintiffs exercised reasonable diligence before, during and after the closing of their
loans.

**A.     The Avery Plaintiffs' Reasonable Diligence**

194.    As a result of the fraudulent concealments by WestStar and All Star, the Avery Plaintiffs
have no actual notice before, at or after the closing of their WestStar loan of the illegal
kickbacks, the exchange of any thing of value between WestStar and All Star, the
Kickback Agreement, the resulting fixed nature of the title and settlement service charges
and the Kickback Overcharge, or the coordinated business relationship of WestStar and
All Star under the Kickback Agreement, All Star Scheme and the pattern of racketeering
activity All Star and WestStar perform in furtherance of the All Star Scheme.

195.    The Avery Plaintiffs exercise reasonable diligence before, during and after the closing of
their loan.

196. The Avery Plaintiffs receive loan documents prepared by WestStar in advance of their closing and review those loan documents. The Avery Plaintiffs' pre-closing loan documents include their "Good Faith" Estimate which WestStar prepared.

197. WestStar and All Star choose to omit from the Avery Plaintiffs' "Good Faith" Estimate any description or statement of the coordinated business relationship between WestStar and All Star, or the fact that All Star has paid anything of value for WestStar's assignment and referral of the Avery Plaintiffs' loan to All Star.

198. WestStar and All Star choose to include in the Avery Plaintiffs' pre-closing documents, including their "Good Faith" Estimate, the fraudulent representations and omission described in ¶¶ 179-185 above.

199. WestStar and All Star choose to include in the Avery Plaintiffs' pre-closing documents the false allocation of fees, and, upon information and belief, a false APR as described in ¶¶168-177.

200. WestStar and All Star make the false representations and omissions in the Avery Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from them, the coordinated business relationship between West Star and All Star, the Kickback Agreement and the All Star Scheme, the fact, nature and amount of the illegal kickbacks related to the Avery Plaintiffs' loan, and the related Kickback Overcharge.

201. As is reasonable under the circumstances, the Avery Plaintiffs believe these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Avery Plaintiffs do not believe, that: (i) a coordinated business relationship exists between WestStar and All Star; (ii) there has been any payment or exchange of a thing of value between WestStar and All Star related to the assignment and

referral of their WestStar loan for title and settlement services, or (iii) the charges attributed to legitimate title and settlement services includes an amount for a Kickback Overcharge unrelated to any legitimate title and settlement service and used for the payment of illegal kickbacks.

202.   The Avery Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, WestStar requires the Avery Plaintiffs to participate in a closing, and they attend and fully participate in the required closing and review all documents with All Star's representative.

203.   At the closing of his loan, the Avery Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Avery Plaintiffs review and sign all documents All Star presents at the closing, including the HUD-1 Settlement Statement.

204.   WestStar and All Star choose to omit from the documents the Avery Plaintiffs receive at their closing, including their HUD-1, any description or statement of the coordinated business relationship between WestStar and All Star under the Kickback Agreement and the All Star Scheme.

205.   WestStar and All Star choose to omit from the documents the Avery Plaintiffs receive at their closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to WestStar related to the Avery Plaintiffs' loan.

206.   WestStar and All Star choose to include in the documents the Avery Plaintiffs receive at their closing, including their HUD-1, the false allocation of fees as described in ¶¶ 168-177.

207.   WestStar and All Star choose to include in the documents the Avery Plaintiffs receive at their closing, including their HUD-1, the false representations and omissions described in ¶¶ 186-191.

208.   WestStar and All Star make the false representations and omissions in the Avery Plaintiffs' loan closing documents for the purposes of concealing, and did so conceal from them, the coordinated business relationship between WestStar and All Star, the Kickback Agreement and All Star Scheme, the fact, nature, and amount of the illegal kickback related to the Avery Plaintiffs' loan,   the Kickback Overcharge and their injuries and actual damages therefrom.

209.   As is reasonable under the circumstances, the Avery Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Avery Plaintiffs do not believe, that: (i) a coordinated business relationship exists between WestStar and All Star, (ii) there has been any payment or exchange of a thing of value between WestStar and All Star related to the assignment and referral of their WstStar loan for title and settlement services, or (iii) the charges attributed to legitimate title and settlement services include an amount for a Kickback Overcharge unrelated to any legitimate title and settlement service and charged to pay for illegal kickbacks.

210.   The Avery Plaintiffs act diligently after their closing.  On or about November 18, 2018, they receive a letter from undersigned counsel describing an investigation of All Star and WestStar.  This is the Avery Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their WestStar loan.

211.   Within days the Avery Plaintiffs contact and retain counsel.  The Avery Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

212.   As a result of WestStar and All Star's fraudulent concealment, and the Avery Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations on their claims were tolled beginning on the date of their loan closing and continuing until the Avery Plaintiffs' learning of facts giving rise to their causes of action, on or about November 18, 2018.

   **B.      The Brownfield Plaintiffs' Reasonable Diligence**

213.   As a result of the fraudulent concealments by WestStar and All Star, the Brownfield Plaintiffs have no actual notice before, at or after the closing of their WestStar loan of the illegal kickbacks, the exchange of any thing of value between WestStar and All Star, the Kickback Agreement, the resulting fixed nature of the title and settlement service charges and the Kickback Overcharge, or the coordinated business relationship of WestStar and All Star under the Kickback Agreement, All Star Scheme and the pattern of racketeering activity All Star and WestStar perform in furtherance of the All Star Scheme.

214.   The Brownfield Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

215.   The Brownfield Plaintiffs receive loan documents prepared by WestStar in advance of their closing and review those loan documents.  The Brownfield Plaintiffs' pre-closing loan documents include their "Good Faith" Estimate which WestStar prepared.

216.   WestStar and All Star choose to omit from the Brownfield Plaintiffs' "Good Faith" Estimate any description or statement of the coordinated business relationship between

WestStar and All Star, or the fact that All Star has paid anything of value for WestStar's assignment and referral of the Brownfield Plaintiffs' loan to All Star.

217.    WestStar and All Star choose to include in the Brownfield Plaintiffs' pre-closing documents, including their "Good Faith" Estimate, the fraudulent representations and omission described in ¶¶ 179-185 above.

218.    WestStar and All Star choose to include in the Brownfield Plaintiffs' pre-closing documents the false allocation of fees, and, upon information and belief, a false APR as described in ¶¶ 168-177.

219.    WestStar and All Star make the false representations and omissions in the Brownfield Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from them, the coordinated business relationship between West Star and All Star, the Kickback Agreement and the All Star Scheme, the fact, nature and amount of the illegal kickbacks related to the Brownfield Plaintiffs' loan, and the related Kickback Overcharge.

220.    As is reasonable under the circumstances, the Brownfield Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Brownfield Plaintiffs do not believe, that: (i) a coordinated business relationship exists between WestStar and All Star; (ii) there has been any payment or exchange of a thing of value between WestStar and All Star related to the assignment and referral of their WestStar loan for title and settlement services, or (iii) the charges attributed to legitimate title and settlement services includes an amount for a Kickback Overcharge unrelated to any legitimate title and settlement service and used for the payment of illegal kickbacks.

221.    The Brownfield Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, WestStar requires the Brownfield Plaintiffs to participate in a closing, and they attend and fully participate in the required closing and review all documents with All Star's representative.

222.    At the closing of his loan, the Brownfield Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Brownfield Plaintiffs review and sign all documents All Star presents at the closing, including the HUD-1 Settlement Statement.

223.    WestStar and All Star choose to omit from the documents the Brownfield Plaintiffs receive at their closing, including their HUD-1, any description or statement of the coordinated business relationship between WestStar and All Star under the Kickback Agreement.

224.    WestStar and All Star choose to omit from the documents the Brownfield Plaintiffs receive at their closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to WestStar related to the Brownfield Plaintiffs' loan.

225.    WestStar and All Star choose to include in the documents the Brownfield Plaintiffs receive at their closing, including their HUD-1, the false allocation of fees as described in ¶¶ 168-177.

226.    WestStar and All Star choose to include in the documents the Brownfield Plaintiffs receive at their closing, including their HUD-1, the false representations and omissions described in ¶¶ 186-191.

227.  WestStar and All Star make the false representations and omissions in the Brownfield Plaintiffs' loan closing documents for the purposes of concealing, and did so conceal from them, the coordinated business relationship between WestStar and All Star, the Kickback Agreement and All Star Scheme, the fact, nature, and amount of the illegal kickback related to the Brownfield Plaintiffs' loan,  the Kickback Overcharge and their injuries and actual damages therefrom.

228.  As is reasonable under the circumstances, the Brownfield Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Brownfield Plaintiffs do not believe, that: (i) a coordinated business relationship exists between WestStar and All Star, (ii) there has been any payment or exchange of a thing of value between WestStar and All Star related to the assignment and referral of their WestStar loan for title and settlement services, or (iii) the charges attributed to legitimate title and settlement services include an amount for a Kickback Overcharge unrelated to any legitimate title and settlement service and charged to pay for illegal kickbacks.

229.  The Brownfield Plaintiffs act diligently after their closing.  On or about November 18, 2018, they receive a letter from undersigned counsel describing an investigation of All Star and WestStar.  This is the Brownfield Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their WestStar loan.

230.  Within days the Brownfield Plaintiffs contact and retain counsel.  The Brownfield Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

231.   As a result of WestStar and All Star's fraudulent concealment, and the Brownfield
       Plaintiffs' reasonable diligence before, during and after the closing of their loan, the
       statute of limitations on their claims were tolled beginning on the date of their loan
       closing and continuing until the Brownfield Plaintiffs' learning of facts giving rise to
       their causes of action, on or about November 18, 2018.

## VI.   Accrual and Tolling of Limitations

232.   The limitations period provided in 15 U.S.C. § 15(b), applicable to claims pursuant to 18
       U.S.C. § 1964**,** is subject to the discovery of injury rule.  *Detrick v. Panalpina,* 108 F.3d
       529 (4th Cir. 1997) *cert. denied* 1997 U.S. Dist. LEXIS 4626.  WestStar's affirmative and
       fraudulent acts precluded WestStar borrowers, including all Plaintiffs and Class
       Members, from discovering the fact of their injuries resulting from the All Star Scheme
       and the pattern of racketeering activity WestStar and All Star perform in furtherance of
       the All Star Scheme.

233.   As a result, Plaintiffs', and Class Members', claim pursuant to 18 U.S.C. § 1964 did not
       accrue, for the purpose of the limitations period provided in 15 U.S.C. § 15(b), until such
       time as Plaintiffs, and Class Members, knew, or should have known, of their injury – for
       the Avery Plaintiffs and the Brownfield Plaintiffs, on or about November 18, 2018.

234.   In addition and in the alternative, as a result of WestStar and All Star's fraudulent
       concealments and Plaintiffs' reasonable diligence before, during and after the closing of
       Plaintiffs' loans, the statute of limitations as to all causes of action pled herein are and
       should be tolled beginning on the date of each Plaintiffs' loan closing and continuing
       until the learning of facts giving rise to the causes of action pled herein – for the Avery
       Plaintiffs and the Brownfield Plaintiffs, on or about November 18, 2018.

235.   Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the Kickback Agreement and the All Star Scheme, and typical of all alleged Class Members' transactions such that all Class Members are entitled to fraudulent concealment tolling of applicable limitations period.

### COUNT I
### Violation of the Real Estate Settlement Procedures Act (RESPA),
### 12 U.S.C. § 2607(a)

236.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

237.   All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

238.   WestStar, by and through its mortgage brokers, loan officers, employees and/or agents, received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

239.   All loans assigned and referred by WestStar to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by WestStar and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

240.   The payment and/or arranging of payment of kickbacks to WestStar by All Star and WestStar's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

241.   Plaintiffs allege claims for violations of 12 U.S.C. §2607(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by WestStar Mortgage, Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2010 and July 31, 2013. Exempted from this class is any person who, during the period of January 1, 2010 through July 31, 2013, was an employee, officer, member and/or agent of WestStar Mortgage, Inc., J.G. Wentworth Home Lending, LLC, or All Star Title, Inc.

(the "RESPA Class").

242.   There are questions of law and fact common to the claims of each and all members of the RESPA Class. These common questions include, but are not limited to:

a.   Whether there existed a referral agreement between WestStar and All Star whereby WestStar agreed to assign and refer WestStar loans, refinances and reverse mortgages to All Star in exchange for receiving kickbacks;

b.   Whether WestStar and its employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

c.   Whether the illegal kickbacks to WestStar and its employees and/or agents violated RESPA;

d.   Whether WestStar and All Star used third party marketing companies to launder kickbacks related to WestStar loans;

e.   Whether Plaintiffs and RESPA Class Members were forced to pay more for said settlement services;

f.   Whether WestStar used sham and/or split invoices and sham payment records to actively and fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

g.  Whether WestStar disclosed or described to any borrower its coordinated business relationship with All Star or the fact that a thing of value had been exchanged between WestStar and All Star related to any WestStar borrower's loan;

h.  Whether WestStar disclosed or described on any borrowers "Good Faith" Estimate, HUD-1 or other loan document WestStar's coordinated business relationship with All Star or the fact that a thing of value had been exchanged between WestStar and All Star related to any borrower's loan;

i.  Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel;

j.  Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

k.  Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

243.  These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

244.  Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RESPA Class Members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

245.  Plaintiffs will fairly and adequately protect the interests of the RESPA Class. The interests of Plaintiffs and all other members of the RESPA Class are identical.

246.  Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S.

District Courts in similar litigation, and will adequately represent the RESPA Class's interests.

247. The RESPA Class consists of borrowers on more than 600 loans, and thus are so numerous that joinder of all members is impracticable.

248. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for WestStar and/or its successor in interest, Defendant J.G. Wentworth.

249. This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

250. Most members of the RESPA Class are unaware of their rights to prosecute a claim against WestStar and/or its successor in interest, Defendant J.G. Wentworth.

251. No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

## COUNT II
## Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962

252. Plaintiffs incorporate the above stated paragraphs as if restated herein.

253. WestStar is a "person" as defined under 18 U.S.C. § 1961(3).

254. WestStar and All Star associate in fact and form an enterprise (the "Enterprise") for the purpose of 18 U.S.C. §1962(a). For a continuous period of at least four years, WestStar

and All Star associate and commit the predicate acts pled herein, which acts are separate and in addition to their legitimate mortgage and settlement service operations, for the common purpose of defrauding borrowers into paying higher and fraudulent prices for title and settlement services. The activities of the Enterprise affect interstate commerce across 35 states.

255. WestStar and All Star associate and perpetrate the All Star Scheme for the purpose of defrauding borrowers into paying fixed prices for title and settlement services and charges that are unrelated to the any legitimate title and settlement service and for the purpose of funding illegal kickbacks, and to thereby deprive borrowers of their money and/or property.

256. The use of the interstate U.S. Mail and wires by WestStar and All Star in furtherance of the All Star Scheme, including as pled in ¶¶ 49-142, constitute mail and wire fraud as defined under 18 U.S.C. §§ 1341 and 1343, serve as predicate acts, and constitute a pattern of racketeering activity.

257. WestStar received, and J.G. Wentworth as its successor in interest continues to receive, income derived from this pattern of racketeering activity in the form of the kickbacks paid by All Star to WestStar, and through the interest, fees and other income earned on the WestStar mortgages, refinances and reverse mortgages resulting from the pattern of racketeering activity.

258. WestStar improperly used and invested the income it received from the pattern of racketeering activity in furtherance of the activities of the Enterprise and for the purpose of luring borrowers into the All Star Scheme in violation of 18 U.S.C. §1962(a).

259. As a direct and proximate result of WestStar's pattern of racketeering activity, Plaintiffs and Class Members were injured and suffered actual damages in the amount of approximately $700 - 905.

260. Plaintiffs allege claims pursuant to 18 U.S.C. §1964(c) on their behalf and pursuant to Fed. R. Civ. P. 23 for violations of 18 U.S.C. § 1962(a) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a loan originated or brokered by WestStar Mortgage, Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2010, and July 31, 2013. Exempted from this class is any person who, during the period of January 1, 2010 through July 31, 2013, was an employee, officer, member and/or agent of WestStar Mortgage, Inc., J.G. Wentworth Home Lending, LLC, or All Star Title, Inc.

261. The RICO Class consists of borrowers on more than 600 loans, and thus are so numerous that joinder of all members is impracticable.

262. There are questions of law and fact common to the claims of each and all members of the RICO Class. These common questions include, but are not limited to:

a. Whether WestStar and All Star formed an enterprise;

b. Whether the activities of the Enterprise affected interstate commerce;

c. Whether one purpose of the All Star Scheme was to deprive borrowers of money or property;

d. Whether WestStar and All Star used the interstate U.S. Mail in furtherance of the activites of the Enterprise including the All Star Scheme,

e. Whether WestStar and All Star used the interstate wires in furtherance of the activities of the Enterprise, including the All Star Scheme;

f. Whether WestStar received income from a pattern of racketeering activity;

g.  Whether WestStar used income derived from a patter of racketeering activity in support of, or in furtherance of, the activities of the Enterprise, including the All Star Scheme;

h.  Whether WestStar actively concealed the All Star Scheme and resulting fixed prices and Kickback and/or Market Overcharge;

i.  Whether Plaintiffs' and RICO Class members knew or should have known of their injuries resulting from WestStar's violation of 18 U.S.C. § 1962(a);

j.  Whether WestStar's and All Star's fraudulent concealments prevented Plaintiffs' and RICO class members from discovering their injuries proximately caused by WestStar's pattern of racketeering activity;

k.  Whether Plaintiffs and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. § 1964(c); and

l.  Whether Plaintiffs and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. § 1964(c).

263.  These common issues of law and fact predominate over any question affecting only individual RICO Class Members.

264.  Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RICO Class Members.

265.  Plaintiffs will fairly and adequately protect the interests of the RICO Class.  The interests of the named Plaintiffs and all other members of the RICO Class are identical.

266.  Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the RICO Class's interests.

267. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for WestStar and/or its successor in interest, Defendant J.G. Wentworth.

268. This action entails questions of law and fact common to RICO Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

269. Most members of the RICO Class are unaware of their rights to prosecute a claim against WestStar and/or its successor in interest, Defendant J.G. Wentworth.

270. No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**WHEREFORE**, Plaintiffs respectfully demand:

a. This Court to certify the RESPA and RICO Classes pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial;

b. Judgment for Plaintiffs and RESPA Members against J.G. Wentworth Home Loans, LLC and award Plaintiffs and RESPA Class Members treble damages for title and settlement services charged by All Star, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c. Judgment for Plaintiffs and RICO Class Members against J.G. Wentworth Home Loans, LLC and award Plaintiffs and RICO Class Members damages in the amount equal to

three times the actual damages caused by WestStar's pattern of racketeering activity pursuant to 18 U.S.C. § 1964(c);

d.  Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5) and 18 U.S.C. § 1964(c); and

e.  For such other and further relief as this Court deems proper.

Respectfully submitted,

_____/s/_____
Timothy F. Maloney, Esq. #03381
Veronica B. Nannis, Esq. #15679
Megan A. Benevento, Esq. #19883
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com
*Co-Counsel for Plaintiffs and Class Members*

_____/s/_____
Michael Paul Smith, Esq. #23685
Melissa L. English, Esq. #19864
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
*Counsel for Plaintiffs and Class Members*

## **PRAYER FOR JURY TRIAL**

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action

Complaint.

_____/s/_____
Timothy F. Maloney, Esq. #03381
Veronica B. Nannis, Esq. #15679
Megan A. Benevento, Esq. #19883
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
vnannis@jgllaw.com
mbenevento@jgllaw.com
*Co-Counsel for Plaintiffs and Class Members*

_____/s/_____
Michael Paul Smith, Esq. #23685
Melissa L. English, Esq. #19864
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
*Counsel for Plaintiffs and Class Members*